#

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

James Respess, Individually and as Personal
Representative of the Estate of Patricia
Respess,

    *Plaintiffs,*

    v.

Travelers Casualty & Surety Company of
America, *et al.*,

    *Defendants.*

Civil Action No.: ELH-10-2937

**AMENDED MEMORANDUM OPINION**[1]

Patricia Respess committed suicide in 2008. As a result of Ms. Respess's death, her husband, James Respess, individually and as personal representative of the Estate of Patricia Respess, Plaintiffs, filed suit against Travelers Casualty & Surety Company of America and The Travelers Indemnity Company of America (collectively, "Insurers" or "Defendants"), alleging claims for intentional infliction of emotional distress (Count One); gross negligence (Count Two); and wrongful death (Count Three), based on the Insurers' refusal to authorize 24-hour supervised care for Ms. Respess.[2] Mr. Respess contends that because Defendants refused to authorize the 24-hour supervised care that Ms. Respess needed, she ingested an overdose of her blood pressure medication on May 5, 2008, and died four days later, on May 9, 2008. *See*

---

[1] The Amended Memorandum Opinion supersedes this Court's Memorandum Opinion (ECF 12). The Court has made minor corrections to the earlier Memorandum Opinion that do not alter its substance.

[2] Suit was filed in the Circuit Court for Baltimore City in August 2010, and was subsequently removed to the federal court, based on diversity jurisdiction. *See* 28 U.S.C. §§ 1332, 1441, and 1446.

Compl. (ECF 2) ¶¶ 10, 35.

The suit is rooted in an incident that occurred in 1987, when Ms. Respess was physically and sexually assaulted while working for National Medical Care, Inc. ("NMC"). *Id.* ¶ 7. As a result of the incident, Ms. Respess suffered numerous psychiatric conditions, for which she obtained workers' compensation benefits. *Id.* ¶ 8. Defendants are the insurance companies that insured NMC with respect to the workers' compensation benefits provided to Ms. Respess. They have moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), claiming it fails to state a claim.

The issues have been fully briefed, and no hearing is necessary to resolve this matter. *See* Local Rule 105.6. For the reasons set forth below, the Court shall grant the Defendants' Motion to Dismiss the Complaint, without prejudice, and shall grant Plaintiffs 20 days leave to amend.

## FACTUAL BACKGROUND

As noted, Ms. Respess was physically and sexually assaulted in 1987, while at work. Compl. ¶ 7. As a result of the incident, she suffered from various psychiatric conditions, including Post Traumatic Stress Disorder ("PTSD"), major depressive disorder with severe and recurrent psychotic symptoms, conversion disorder, dissociative identity disorder, and personality disorder. *Id.* ¶ 8. Ms. Respess "began receiving treatment for these in approximately 1999 to 2000."[3] *Id.* ¶¶ 9, 10. From the outset of Ms. Respess's treatment until her death in 2008, the Insurers "approved and paid" her medical expenses, "pursuant to a worker's compensation claim." *Id.* ¶ 10.

On or about January 2, 2008, Ms. Respess was admitted to the Mental Health Facility at Peninsula Regional Medical Center in Salisbury, Maryland for "depression, anxiety and

---

[3] The Complaint is silent as to whether Ms. Respess was treated in the period between 1987 and 1999.

flashbacks." *Id.* ¶ 12. She was transferred to the "Trauma Disorders Program at Sheppard Pratt," as an in-patient, on January 23, 2008, and remained there until her discharge on April 25, 2008. *Id.* ¶¶ 12, 13, 16.[4] Upon discharge, Ms. Respess returned to her home. *Id.* ¶¶ 14, 19.

During the weeks preceding her discharge from Sheppard Pratt, Ms. Respess "experience[d] flashbacks," and told her physicians and counselors of her fear of discharge and her suicidal thoughts. *Id.* ¶¶ 15, 16. On April 11, 2008, while still hospitalized, Ms. Respess expressed difficulty in "finding a 'treatment team'" near her Eastern Shore residence. *Id.* ¶ 17. On April 21, 2008, she told her physicians and counselors that "she was discouraged because she did not feel that any outpatient medical providers would give her the care that she needed." *Id.* ¶ 18. In addition, two weeks prior to his wife's discharge, Mr. Respess asked Sheppard Pratt counselors to place his wife in a step-down facility, in lieu of a discharge without any supervision.[5] *Id.* ¶ 20.

Five days after Ms. Respess's discharge, Rebecca Rementer, a home health care nurse, visited Ms. Respess to assess her progress. *Id.* ¶ 21.[6] Ms. Rementer determined that Ms. Respess had fallen several times since her discharge; was anxious and depressed; and was experiencing paranoid hallucinations as well as recurrent suicidal thoughts. *Id.* ¶¶ 22, 25. Ms. Rementer learned from Ms. Respess's medical history that, in the past, Ms. Respess had attempted suicide by overdosing. *Id.* After Ms. Respess disclosed to Ms. Rementer that she had "accidentally" taken double doses of her medications two nights earlier, Ms. Rementer

[4] Paragraph fourteen of the Complaint states that Ms. Respess was discharged "on April 25, 2008," while paragraph nineteen provides that Ms. Respess was discharged "[o]n or about April 25, 2008."

[5] The Complaint does not indicate how the Sheppard Pratt counselors responded to Mr. Respess's request.

[6] The Complaint does not identify who dispatched Ms. Rementer.

concluded that Ms. Respess was practicing unsafe medication management. *Id.* ¶¶ 22, 23.

In Ms. Rementer's view, Ms. Respess's "prognosis was poor." *Id.* ¶ 26. Moreover, Ms. Rementer believed that Ms. Respess urgently needed 24-hour supervision and, if psychiatric assistance were not provided, Ms. Respess would further decline. *Id.* ¶ 26. Accordingly, Ms. Rementer called the Defendants, advising of Ms. Respess's suicidal thoughts, and stating that Ms. Respess needed 24-hour supervised care.[7] *Id.* ¶ 27. Nevertheless, the Defendants "refused to authorize the needed treatment." *Id.*

Thereafter, Ms. Rementer enlisted the assistance of Martin Book, M.D., a psychiatrist who had previously treated Ms. Respess. *Id.* ¶ 28. Dr. Book called the Defendants and requested "immediate" 24-hour supervised care for Ms. Respess.[8] *Id.* However, Defendants again refused to authorize 24-hour supervised care, "even though [they] were aware that Ms. Respess' psychiatric condition had declined since her discharge from Sheppard Pratt 5 days earlier," and knew of her "long history" of psychiatric illness. *Id.* ¶ 29.

Ms. Respess's condition continued to decline. *Id.* ¶ 30. On or about May 4, 2008, Mr. Respess wrote a letter to Sheppard Pratt expressing his concern regarding his wife's declining health, and requesting that she be placed in a residential setting with 24-hour supervision. *Id.* ¶ 31.[9] Defendants stated that, although Ms. Respess's psychiatrist had diagnosed her with PTSD,

---

[7] The Complaint does not allege that Ms. Rementer contacted Ms. Respess's physicians at Sheppard Pratt regarding Ms. Respess's condition.

[8] The Complaint does not specify when Dr. Book last treated Ms. Respess, nor does it indicate that he personally examined Ms. Respess before calling the Insurers.

[9] The Complaint does not reflect the identity of the person(s) to whom Mr. Respess wrote, or the response, if any.

"they did not believe that [she] actually suffered from PTSD...." *Id.* ¶ 32.[10]  On May 5, 2008, Ms. Respess wrote a suicide note stating that "she did not have any fight in her to challenge the Defendants anymore...." *Id.* ¶ 34.  On that date, she took an overdose of her blood pressure medication, fell into a coma, and died four days later, on May 9, 2008.  *Id.* ¶¶ 10, 34, 35.

## STANDARD OF REVIEW

As noted, Defendants have moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), alleging that it fails to state a claim.  Such a motion tests the sufficiency of the Complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

Under Fed. R. Civ. P. 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  The purpose of the rule is to provide the defendant with "fair notice" of the claim.  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  To that end, Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007).  The showing must consist of more than "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 1940; *see Twombly*, 550 U.S. at 555 (the "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").

Dismissal is mandated if the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  *See Simmons v. United Mort. and*

---

[10] The Complaint does not specify to whom Defendants made the statement.

*Loan Inv., LLC*, __ F.3d __, 2011 WL 184356, at *10 (4th Cir. Jan. 21, 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009). In "determining whether a complaint states a plausible claim for relief . . . the reviewing court [must] draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950. The Supreme Court said in *Iqbal*, 129 S.Ct. at 1949: "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See also Twombly*, 550 U.S. at 556. But, "'the court need not accept the legal conclusions drawn from the facts, and need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Simmons*, 2011 WL 184356, at *10 (quoting *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385-86 (4th Cir. 2009)) (quotation marks and alteration marks omitted in *Simmons*).

Nevertheless, "The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds,* 468 U.S. 183 (1984). Moreover, given the posture of this case, the Court must "accept the well-pled allegations of the complaint as true," and "construe facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Boss v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 764 (4th Cir. 2003).

## DISCUSSION

### I. Count One: Intentional Infliction of Emotional Distress

Plaintiffs allege that, in denying 24-hour supervised care to Ms. Respess, the Defendants' actions "were intentional and/or reckless and in deliberate disregard of a high degree of probability that emotional distress would result to Patricia Respess." *See* Compl. ¶ 37. Further, they state that "the conduct of the Defendants' employees, servants and/or agents, was extreme,

outrageous and beyond the bounds of decency in society" and "malicious, willful and intentional." *Id.* ¶¶ 38, 39. According to Plaintiffs, Ms. Respess would not have committed suicide, "but for the actions of the Defendants' employees, servants and/or agents." *Id.* ¶¶ 40, 41, 42.

Defendants counter: "The Complaint lacks any factual allegations of 'extreme and outrageous' conduct necessary to state a claim for intentional infliction of emotional distress." *See* Defendants' Memorandum in Support of their Motion to Dismiss the Complaint with Prejudice ("Memorandum," ECF 9-1) 2. Moreover, Defendants contend that their "decision to deny authorization for payment" is insufficient to state a claim because it "was not for the purpose of causing the decedent's suicide." Noting that Defendants' conduct was supported by the Sheppard Pratt physicians who discharged Ms. Respess, Memorandum 2, the Insurers elaborate: "If such symptoms and thoughts of suicide urgently required 24-hour supervision, the decedent would not have been discharged home after her four-month hospital stay."[11] Defendants' Reply Memorandum in Support of their Motion to Dismiss the Complaint with Prejudice ("Reply," ECF 11) 2. Defendants add that, if Ms. Respess were "actively suicidal," then "nothing prevented her from seeking emergency room treatment." *Id.* at 5.

---

[11] Specifically, Defendants contend: "[M]edical professionals at Sheppard Pratt determined that [Ms. Respess] could live at home over her and Plaintiff's objections." Memorandum 8. Defendants further state, *id.* at 9:

> The health care nurse observed similar conditions to those observed by the medical professionals at Sheppard Pratt. The only difference is that the medical professionals at Sheppard Pratt determined (after three months of treatment) that Mrs. Respess did not need 24-hour supervised care and could be at home, while the health care nurse reached a different conclusion.

In their Reply, the Defendants add: "Defendants' conduct is supported by the decisions made by medical professionals a few days earlier that—based upon the same symptoms and similar thoughts of suicide—the decedent no longer needed 24-hour care." Reply 2.

In addition, Defendants rely on the exclusive remedies set forth in the Maryland Workers' Compensation Act (the "Act"), Md. Code (2008 Repl. Vol., 2009 Supp.), § 9-101 *et seq*. of the Labor and Employment Article ("L.E."). Memorandum 17. In response, Plaintiffs explain that intentional torts provide an exception from the Act's exclusivity provisions. Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opposition," ECF 10) 14.

"Intentional infliction of emotional distress is a cognizable tort in Maryland." *Abrams v. City of Rockville*, 88 Md. App. 588, 597, 596 A.2d 116, 126 (1991). However, the tort "is rarely viable, and is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Snyder v. Phelps*, 580 F.3d 206, 231 (4th Cir. 2009) (Shedd, J., concurring) (quoting *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665 A.2d 297, 319 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996)) (internal citations and quotations omitted in *Bagwell*), *aff'd*, __ U.S. __, 131 S.Ct. 1207 (2011); *see Farasat v. Paulikas*, 32 F. Supp. 2d 244, 247 (D. Md. 1997).

To recover in Maryland for the tort of intentional infliction of emotional distress,[12] a plaintiff must show that a defendant's conduct was (1) intentional or reckless, (2) extreme and outrageous, (3) causally connected to plaintiff's emotional distress, and (4) that the resulting distress was severe. *Crouch v. City of Hyattsville*, 2010 U.S. Dist. LEXIS 97166, at *22; *see Snyder*, 580 F.3d at 231; *Baltimore-Clark v. Kinko's Inc.*, 270 F. Supp. 2d 695, 701 (D. Md. 2003); *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653, 584 A.2d 69, 74-75 (1991); *Harris v.*

---

[12] In an action based upon diversity of citizenship, the law of the forum state controls. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008). In tort actions, Maryland adheres to the *lex loci delicti* rule, meaning it applies the substantive law of the state where the wrong occurred. *Ben-Joseph*, 529 F. Supp. 2d at 606 (citing *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 619, 925 A.2d 636, 648-49 (2007)) (other citations omitted). Thus, Maryland law applies here.

*Jones*, 281 Md. 560, 566-67, 380 A.2d 611, 614 (1977); *Borchers v. Hrychuk*, 126 Md. App. 10, 18, 727 A.2d 388, 392 (1999). Moreover, "'[e]ach of these elements must be pled and proved with specificity. It is not enough for a plaintiff merely to allege that they exist; he must set forth facts that, if true, would suffice to demonstrate that they exist.'" *Crouch,* 2010 U.S. Dist. LEXIS 97166, at *23 (quoting *Foor v. Juvenile Servs. Admin.*, 78 Md. App. 151, 175, 552 A.2d 947, 959 (1989)); *see also Arbabi v. Fred Meyers, Inc.,* 205 F. Supp. 2d 462, 466 (D. Md. 2002). Notably, "[f]ailure to allege or prove any one of these elements is fatal[.]" *Abrams*, 88 Md. App. at 598, 596 A.2d at 120.

The "extreme and outrageous" standard is quite high. *See generally Bagwell*, 106 Md. App. at 515, 665 A.2d at 319 (the tort of intentional infliction of emotional distress is "rigorous, and difficult to satisfy"). The defendant's conduct must be "'so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized [community].'" *Farasat*, 32 F. Supp. 2d at 247-48 (quoting *Harris*, 281 Md. at 567, 380 A.2d at 614). Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Farasat*, 32 F. Supp. 2d at 248 (quoting *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59-60, 502 A.2d 1057, 1064, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986)).

Several provisions of the Act are also relevant here. The Act imposes liability upon an employer, without regard to fault, for "an accidental personal injury sustained by the covered employee," L.E. § 9-501(a)(1) and (b), if the accidental injury "arises out of and in the course of employment. . . . " L.E. § 9-101(b). Generally, under L.E. § 9-506(a), a covered employee "is not entitled to compensation or benefits under this title as a result of: (1) an intentional, self-inflicted accidental personal injury . . ." Nevertheless, the Maryland Court of Appeals "has held

that, depending on the circumstances, death benefits under the Act may be paid where the worker has in fact committed suicide." *Young v. Hartford Accident and Indemnity Co.*, 303 Md. 182, 190, 492 A.2d 1270, 1274 (1985) (citing *Baber v. Knipp & Sons*, 164 Md. 55, 163 A. 862 (1933)).

L.E. § 9-660 obligates the employer/insurer to provide medical benefits to a covered employee. It states, in part:

> (a) *In general.*—In addition to the compensation provided under this subtitle, if a covered employee has suffered an accidental personal injury, . . . the employer or its insurer promptly shall provide to the covered employee, as the Commission [i.e., the State Workers' Compensation Commission] may require:
>
> (1) medical, surgical, or other attendance or treatment;
>
> (2) hospital and nursing services;
>
> (3) medicine;
>
> * * *
>
> (b) *Duration.*—The employer or its insurer shall provide the medical services and treatment required under subsection (a) of this section for the period required by the nature of the accidental personal injury, compensable hernia, or occupational disease. . . .[13]

L.E. § 9-509 is particularly noteworthy. It provides:

### § 9-509. Exclusivity of compensation

> (a) *Employers.* -- Except as otherwise provided in this title, the liability of an employer under this title is exclusive.
>
> (b) *Covered employees and dependents.* -- Except as otherwise provided in

---

[13] L.E. § 9-664 provides, in part, that if the Commission finds that the employer or insurer

> failed, without good cause, to pay for treatment or services required by § 9-660 . . . within 45 days after the Commission, by order, finally approves the fee or charge for the treatment or services, the Commission may impose a fine on the employer or insurer, not exceeding 20% of the amount of the approved fee or charge . . . .

this title, the compensation provided under this title to a covered employee or the dependents of a covered employee is in place of any right of action against any person.

* * *

(d) *Exception -- Deliberate act.* -- If a covered employee is injured or killed as the result of the deliberate intent of the employer to injure or kill the covered employee, the covered employee or, in the case of death, a surviving spouse, child, or dependent of the covered employee may:

(1) bring a claim for compensation under this title; or

(2) bring an action for damages against the employer.

Notably, "Insurance carriers who contract as authorized by [the Act] to assume an employer's liability under the Act, '. . . stand in the position of the employer.'" *Donohue v. Maryland Cas. Co.*, 248 F. Supp. 588, 590 (D. Md. 1965), *aff'd*, 363 F.2d 442 (4th Cir. 1966) (quoting *Flood v. Merchants Mutual Ins. Co.*, 230 Md. 373, 377, 187 A.2d 320, 322 (1963)). *See also Young*, 303 Md. at 200, 492 A.2d at 1279 ("The availability to an insurer of the exclusivity defense depends on identifying the insurer with the employer under circumstances where the employer would be liable only for compensation and not for tort damages.") Thus, the exclusivity provision of L.E. § 9-509 does not extend to claims against an insurer "for damages based upon an intentional tort arising out of a compensation carrier's failure to pay benefits." *Gallagher v. Bituminous Fire & Mar. Ins. Co.*, 303 Md. 201, 207, 492 A.2d 1280, 1282 (1985).[14] Accordingly, an underlying claim for physical injury "is separate from" a claim for

---

[14] In *Gallagher*, the Maryland Court of Appeals relied upon Md. Code (1957, 1979 Repl. Vol.), Art. 101, titled "Workmen's Compensation," the predecessor to the Act. In 1991, the Maryland Legislature repealed Article 101, amended it, and reenacted it in the new Labor and Employment Article. Of import here, Art. 101, § 15, provided:

[E]very employer subject to the provision of this article, shall pay or provide as required herein compensation . . . for the disability or death of his employee resulting from an accidental personal injury sustained by the employee

tortious injury based on an insurer's intentional failure to pay benefits. *Id.* at 208, 492 A.2d at 1283.

*Young*, *supra*, 303 Md. 182, 492 A.2d 1270, is instructive.  In April 1978, Young suffered physical and emotional trauma as a result of a workplace assault.  *Id.* at 186, 492 A.2d at 1272.  In May 1978, the Commission ordered the insurer, Hartford Accident and Indemnity Co. ("Hartford"), and the employer to pay temporary total disability and to provide prompt medical treatment.  *Id.*  In November 1978, Young's attorney asked Hartford to authorize medical treatment from Dr. Alan Peck.  *Id.* at 187, 492 A.2d at 1272.  Hartford refused, "despite its never having had Young examined by a psychiatrist nor its having any medical information to indicate lack of a causal connection between the assault and the psychiatric condition."  *Id.*  In February 1979, Young was examined by Dr. Michael Potash, a physician selected by Hartford, who told Hartford that Young should continue the psychiatric care that she was then receiving from Dr. Peck.  *Id.*

After a hearing, the Commission entered an order of May 10, 1979, requiring the employer and Hartford to "'provide medical treatment unto the claimant ….'" *Id.* (quoting the Commission's order).  In August 1979, Dr. Peck informed Hartford that Young had attempted to commit suicide, and that any "'pressure by [Hartford] for an outside medical evaluation would only put more tension on her and lead to a collapse.'" *Id.* at 187-88, 492 A.2d at 1272.  Nevertheless, Hartford insisted on a second psychiatric evaluation.  *Id.* at 188, 492 A.2d at 1272-73.  And, "'to pressure [Young] into submitting to another [psychiatric] examination [Hartford]

---

arising out of and in course of his employment without regard to fault as a cause of such injury . . .

The liability prescribed by the last preceding paragraph shall be exclusive....

The Act contains analogous provisions.  *See* L.E. § 9-501(a), *supra*; L.E. § 9-509(a), *supra*.

refused to pay" any further benefits or expenses. *Id.*, 492 A.2d at 1273. Then, on September 5, 1979, Dr. Peck again advised Hartford that "'any pressure by [Hartford] for a second opinion by a psychiatrist of its own choice would throw [Young] over into a psychosis or severe depression and suicide.'" *Id.* at 187-88, 492 A.2d at 1273. Nevertheless, on September 7, 1979, Dr. Henderson performed Hartford's requested evaluation, and informed Hartford that Young was "temporarily, totally disabled and that the disability is compensable." *Id.* Yet, Hartford did not pay Young's medical bills. *Id.* Young called Hartford's adjuster, who told Young "that she is 'crazy, and "if it was up to me you would not get a penny."'" *Id.* (quoting Young, quoting the adjuster). Thereafter, on September 11, 1979, Young attempted suicide, and was hospitalized for several months. *Id.*

Young subsequently sued Hartford for negligence and intentional infliction of emotional distress. *Id.* at 186. After the trial court granted judgment for Hartford on demurrer, Young appealed. She argued that Hartford pressured her economically to present herself for a further psychiatric evaluation, which caused her to attempt suicide. *Id.* at 185-86, 492 A.2d at 1271. Moreover, she contended that her claim did not arise out of Hartford's failure to pay compensation benefits; rather, it arose out of "'the injury she sustained as a result of the insistence of the insurance company that she be examined again.'" *Id.* at 189, 492 A.2d at 1273. Therefore, Young maintained "that the injuries sued upon arise out of an incident which is separate and distinct from the initial work-related assault so that any medical expenses and disability resulting from the second incident are not covered by the Act." *Id.* at 189-90, 492 A.2d at 1274. In response, Hartford argued, *inter alia*, that the Act was Young's exclusive

remedy under the Act.[15]

The Maryland Court of Appeals said, *id.* at 189, 492 A.2d at 1274: "This Court has held that, depending on the circumstances, death benefits under the Act may be paid where the worker has in fact committed suicide. *See Baber v. Knipp & Sons*, 164 Md. 55, 163 A. 862 (1933)." The court continued, 303 Md. at 191, 492 A.2d at 1274:

> [T]he fact that the declaration before us admits that the plaintiff's injuries are self-inflicted in an attempted suicide does not, in and of itself, mean that Hartford's exclusivity argument is foreclosed.[] A suicide attempt is not always an intervening cause which breaks the nexus between the accidental injury and the injury suffered in the suicide attempt. The issue turns on the facts in a given case.

Further, the *Young* Court said, *id.* at 193, 492 A.2d at 1275 (emphasis added):

> [T]he allegations set forth an unbroken chain of proximate causation which continues from the emotional trauma suffered in the assault arising out of and in the course of Young's employment on to and through the attempted suicide. Under Young's pleading the injuries suffered in the suicide attempt are an aggravation of the work-related injury. Under the allegations, the entire emotional illness is compensable under the Act. *The next question is whether Hartford, which is not the employer, enjoys an exclusivity defense to Young's negligence claim.*

In its discussion, the *Young* Court referred to 2A Arthur Larson, THE LAW OF WORKMEN'S COMPENSATION § 72.97 (1985), which provides: "'[A] distinction should be drawn between the carrier's function of *payment* for benefits and services, on the one hand, and, on the other, any function it assumes in the way of direct or physical performance of services related to the [Act]. For negligent performance of the latter it should be liable in tort as a "person other than the employer" . . . .'" *Young,* 303 Md. at 195, 492 A.2d at 1276 (emphasis added).

The court explained, *id.* at 195-96, 492 A.2d at 1276-77 (emphasis added):

> [W]e shall assume that the referral by Hartford of Young to Dr. Henderson for an examination and report is properly to be classified as claims investigation activity

---

[15] The insurer relied on the predecessor statute, Md. Code (1957, 1979 Repl. Vol.), art. 101, § 15, *supra*.

by the insurer, even though a substantial argument could be made that such examinations and evaluations may contribute to diagnosis and treatment as well. Claims investigation is one of the services which the employer buys from the compensation insurance carrier. Young's declaration treats Dr. Henderson as an independent contractor vis-a-vis Hartford. Hartford did not render the subject claim evaluation service through its employees for Young's employer. Consequently, even under the test suggested by Professor Larson, *benefits under the Act would be the exclusive remedy for Young against Hartford under count I* [i.e., negligence]. As to count I we hold that the trial court properly entered judgment for Hartford.

But, the *Young* Court reversed the trial court as to the claim for intentional infliction of emotional distress. *Id.* at 186, 492 A.2d at 1272. It stated, *id.* at 200, 492 A.2d at 1279: "We hold that at least one way in which an insurer can become liable for damages for an intentional tort committed on a claimant is if the injury to the claimant results from the deliberate intention of the insurer to produce such injury."

In reviewing the elements of the tort of the intentional infliction of emotional distress, the court recognized "a limitation on the tort." *Id.* at 197, 492 A.2d at 1277. It noted that a party "is never liable … where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.'" *Id.* (quoting Restatement (Second) of Torts §46 (1965), Comment G). Therefore, it determined that the suit did not state a cause of action for intentional infliction of emotional distress merely because Hartford "insisted on a further examination by a doctor of its own choice, to assess Young's current condition." *Young,* 303 Md. at 197, 492 A.2d at 1277. But, based on the additional allegations in the suit, it concluded that a claim had been pleaded. In particular, it pointed to the allegations (which Young ultimately would have to prove) that the "sole purpose" of the second examination was "to harass" Young to abandon her claim or "into committing suicide." *Id.* at 198-99, 492 A.2d at 1278. Of import here, the court reasoned, *id.* at 199, 492 A.2d at 1278:

If the "sole purpose of Doctor Henderson's examination" is proven and found to be as alleged, then the physician conspired with Hartford to harass Young into abandoning her claim or into committing suicide because the allegation excludes any proper medical or claims-evaluation motive for the examination. Under such a finding Hartford would not have been exercising its legal rights in a permissible way. Conversely, if Dr. Henderson is found to have conducted a bona fide examination, the privilege would apply, even if Hartford intentionally proceeded knowing the examination would cause Young such severe emotional distress as to satisfy the elements of the tort.

*Gallagher*, 303 Md. 201, 492 A.2d 1280, also provides guidance. There, a workers' compensation claimant and his wife sued the compensation insurer, based on a failure to timely pay disability benefits and medical bills in accordance with the Act. *Id.* at 204, 492 A.2d 1281. The plaintiffs alleged counts of negligence, "'Tortious Delay in Payment,'" intentional infliction of emotional distress, and "'consortium.'" *Id.* (quoting plaintiffs). The trial court entered judgment for the insurer on demurrer, on the ground that the Act's remedy was exclusive. *Id.*

The Maryland Court of Appeals determined that the trial court's "holding was too broad" because the plaintiffs' claim of intentional infliction of emotional distress was "not legally precluded by the exclusivity of compensation." *Id.* Thus, the court rejected the insurer's contention "that the insurer enjoys an exclusivity defense for all activity in the claims process, including intentional torts." *Id.* at 208, 492 A.2d at 1283. Nevertheless, the court concluded that the plaintiffs failed to state a viable cause of action for intentional infliction of emotional distress. *Id.* at 210, 492 A.2d at 1284.

The court accepted that the insurer "made a deliberate decision not to pay" benefits, in violation of a Commission order. *Id.* at 210, 492 A.2d at 1284. Yet, it regarded as "rare" the case in which "facts arising out of the nonpayment of workers' compensation benefits can satisfy the elements of the tort," *id.* at 211, 492 A.2d at 1285, and concluded that the plaintiffs "woefully" failed to state a claim for intentional infliction of emotional distress. *Id.* Acknowledging that "it

is conceivable that the tort might be committed by means of withholding benefits," *id.* at 212, 492 A.2d at 1285, the court nonetheless indicated that the plaintiffs must allege conduct that goes "'beyond all possible bounds of decency, … and [be] utterly intolerable in a civilized community.'" *Id.* at 211*,* 492 A.2d at 1285 (citation omitted). On that basis, the court remanded to permit the claimant to amend the claim. *Id.* at 213*,* 492 A.2d at 1285. *See also Great Atlantic & Pacific Tea Co. v. Imbraguglio*, 346 Md. 573, 589, 697 A.2d 885, 893 (1997) ("In sum, a workers' compensation self-insurer cannot use its status as such to shield itself from the normal obligations attendant upon those acts unrelated to its role as a workers' compensation insurer.").

*Abrams v. City of Rockville, supra*, 88 Md. App. 588, 596 A.2d 116, is also noteworthy. There, a child and her parents brought suit for intentional infliction of emotional distress, because the child was allegedly traumatized by a popular horror movie shown during an after school program. The trial court granted summary judgment in favor of the defendants. As to the intentional tort claim, the Maryland Court of Special Appeals affirmed, concluding that the plaintiffs failed to satisfy the first two elements of the tort. It said, *id.* at 599-600, 596 A.2d at 121:

> [R]easoning minds could perhaps differ over whether the showing of this movie to a seven-year-old, or to Andrea in particular, was a wise or unwise, prudent or negligent thing to do; but a reasoning mind could not properly conclude that the defendants desired to inflict emotional distress on Andrea, or that they knew that such distress was substantially certain to occur, or that they acted in deliberate disregard of a high probability that such distress would follow. Indeed, it demonstrates quite the opposite-that there was some concern over the possible effect of some parts of the movie on the children, but that efforts were made to assure that the young viewers would not be adversely affected, and that there was no indication during the showing of the movie that those efforts were unavailing.

The cases discussed above teach that the allegations of Count One, in the light most favorable to Plaintiffs, are woefully deficient in satisfying the exacting burden of being "extreme and outrageous" so as to "'go beyond all possible bounds of decency, and to be regarded as

atrocious and utterly intolerable in a civilized society.'" *Farasat*, 32 F. Supp. 2d at 247-48 (quoting *Harris*, 281 Md. at 567, 380 A.2d at 614).

To be sure, Defendants had knowledge of Ms. Respess's long history of mental illness, including her suicidal ideations; the Insurers paid her medical claims, apparently without dispute, for years. Of relevance here, Ms. Respess was hospitalized at Sheppard Pratt from early January through late April of 2008, and there is no contention that the Insurers played any role in the decision to discharge her. Moreover, shortly before her discharge, Ms. Respess repeatedly expressed concerns to hospital personnel about her impending discharge, her ability to obtain adequate care at home, and her suicidal ideations. Her husband unsuccessfully sought supervised care. Nevertheless, Ms. Respess was discharged on April 25, 2008.

A few days after Ms. Respess's discharge, the home health care nurse and a former treating physician asked the Insurers to approve 24 hour supervised care for Ms. Respess. The Insurers' refusal to approve that request is at issue here. But, significantly, there is no allegation that, after her discharge, a treating physician sought 24-hour supervision, and that the Insurers declined that request. Moreover, there is no allegation (such as was alleged in *Young*) that the Insurers' "sole purpose" in denying the request for 24-hour supervision was "to harass" Ms. Respess "into abandoning her claim or into committing suicide. . . ."

The Insurers are not health care providers. Under the facts alleged, and all reasonable inferences drawn from the facts, their failure to authorize 24-hour supervised care, as requested by a nurse, as well as a doctor who had not examined Ms. Respess in connection with the request, does not amount to the kind of extreme and outrageous conduct necessary to constitute the tort of intentional infliction of emotional distress. *See, e.g., Moore v. W. Forge Corp.*, 192 P.3d 427, 435 (Colo. App. 2007) (stating that "the burden on claims administrators to guard

against suicide would be extremely high because they would be required to make judgments about the mental health of insureds. Claims administrators do not have special expertise or professional training with which to make such judgments."), *cert. denied*, 2008 Colo. LEXIS 766 (Colo. 2008).

## II. Count Two: Gross Negligence

Plaintiffs allege that Defendants "had a duty to employ reasonable measures" when "managing the medical and psychiatric treatment of Patricia Respesss." Compl. ¶ 45. They aver that Mr. and Ms. Respess experienced "severe and extreme emotional distress" as a result of the Insurers' "gross and reckless" conduct in refusing to authorize 24-hour supervised care for Ms. Respess, and that this distress led Ms. Respess "to take her life, which would not have occurred but for the actions of the Defendants' employees, servants and/or agents." *Id.* ¶¶ 45, 46, 47, 49, 50. According to Plaintiffs, "Defendants' employees, servants and/or agents['] conduct was wanton, extraordinary, outrageous and in utter disregard of plaintiff Patricia Respess' life." *Id.* ¶ 48.[16]

Defendants counter that, under Maryland law, there is no cause of action for grossly negligent infliction of emotional distress. Moreover, Defendants maintain that they "do not owe any tort duties to Plaintiff or decedent" and that their denial of authorization for 24-hour care "was not the proximate cause of decedent's death." *See* Memorandum 2; *see also* Reply 7. Accordingly, they argue that Plaintiffs have not stated a viable cause of action for gross negligence.

In Maryland, "[g]ross negligence has been equated with 'wilful and wanton misconduct,'

---

[16] Count Two is captioned "Gross Negligence." However, Plaintiffs do not use the words "gross negligence" in the text of their Complaint or in their Opposition. Rather, Plaintiffs state that Defendants' conduct was "gross and reckless."

a 'wanton or reckless disregard for human life or the rights of others.'" *Foor, supra*, 78 Md. App. at 175, 552 A.2d at 956 (citations omitted). *See Romanesk v. Rose*, 248 Md. 420, 423, 237 A.2d 12, 14 (1968) ("'a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist'") (citation omitted); *Wells v. State*, 100 Md. App. 693, 702-03, 642 A.2d 879, 883-84 (1994) (stating that gross negligence "implies malice and evil intention") (citations and quotations omitted).

*McCoy v. Hatmaker*, 135 Md. App. 693, 699, 763 A.2d 1233, 1236 (2000), *cert. denied*, 364 Md. 141, 771 A.2d 1070 (2001), is instructive. While William McCoy was driving his co-worker to their place of employment, McCoy's head dropped down and the car swerved off the road. *Id.* at 699, 763 A.2d at 1236. The co-worker grabbed the steering wheel and engaged the emergency brake to prevent the car from hitting parked vehicles. *Id.* at 699-700, 763 A.2d at 1273. After the car came to a stop, McCoy was still nonresponsive and making a gargling noise. *Id.* at 700, 763 A.2d at 1273. The co-worker flagged down a passing police vehicle. Upon checking McCoy's pulse, the policeman told the co-worker that McCoy had a "'small pulse,'" and he called for assistance. *Id.*

Officer Schwaab, who was qualified as a first responder and EMT, arrived on the scene within a minute of hearing the call for assistance. *Id.* Officer Schwaab did not feel a pulse and was about to start cardiopulmonary resuscitation ("CPR") when he noticed an ambulance rounding the corner. *Id.* Officer Schwaab then "greeted the ambulance crew with the news that McCoy was in full cardiac arrest" and "Paramedic Hatmaker ran to McCoy's car and assessed his condition." *Id.* at 701, 763 A.2d at 1273. Based on his observations, *inter alia*, that McCoy had no pulse, had dilated and fixed pupils, had released bodily fluids, and had a decreased body

temperature, Paramedic Hatmaker determined that McCoy "was dead and was not a viable candidate for resuscitation." *Id.* at 701, 763 A.2d at 1237.

McCoy's wife, individually and as personal representative of McCoy's estate, brought a wrongful death and survival action, claiming that Hatmaker, Schwaab, and others were grossly negligent in failing to render appropriate aid to McCoy. *Id.* at 701-02, 763 A.2d at 1237-38. According to the plaintiff, the emergency medical responders failed to follow established emergency protocols, set forth in the Maryland State Protocols for Cardiac Rescue Technician and emergency Medical Technician/Paramedic Guidelines for deceased cases ("MIEMSS protocols"). *Id.* at 701-02, 763 A.2d at 1238.

The trial court granted summary judgment to the defendants on the ground that the plaintiff failed to set forth a prima facie case of gross negligence, the standard for determining liability under the Good Samaritan Act, Md. Code (1998 Repl. Vol.), § 5-603 of the Courts and Judicial Proceedings Article ("C.J."). *Id.* at 705, 763 A.2d at 1239-40. On appeal, the Maryland Court of Special Appeals concluded that any error in medical judgment did not constitute gross negligence. *Id.* at 708, 763 A.2d at 1241. Of import here, the court said, *id.* at 713-14, 763 A.2d at 1244 (emphasis added):

> We agree with the [trial] court's reasoning and believe it to be consistent with the standard we expressed in *Tatum* [*v. Gigliotti*, 80 Md. App. 559, 568, 565 A.2d 354, 358 (1989) (emphasizing the standard that "gross negligence has been equated with 'wilful and wanton misconduct,' a 'wanton or reckless disregard for human life or for the rights of others.'") (citation omitted)[17]]. Were we Baltimore

---

[17] In *Tatum*, an individual suffering from a severe asthma attack requested emergency aid and subsequently died. 80 Md. App. 559, 565 A.2d 354. The paramedics had escorted the individual to the ambulance, rather than transport him by stretcher, and did not administer much oxygen, because the individual "resisted." *Id.* at 562-63, 565 A.2d at 355. Paramedic Gigliotti testified that the victim slid off the ambulance's bench seat and fell on the ambulance floor when the ambulance rounded the corner. *Id.* at 563, 565 A.2d at 355. The ambulance report, signed by Gigliotti, provided that the victim "'was conscious, stable, pupils normal, and pupils were equal.'" *Id.* The emergency room nurse, however, testified that the victim "was in complete

21

City officials responsible for Hatmaker's job performance, we might recommend retraining in the protocols of emergency care, or even disciplinary action. *As judges, however, we cannot equate a well-intended error in medical judgment-even if it costs the patient's life-with wanton and reckless disregard for the life of that patient*. Medical protocols seek to establish best practices for successfully treating certain conditions. Failure to follow such protocols might sometimes be deliberate, but more often than not, we believe, such failure to heed them during an emergency would be purely accidental and, therefore, at most simple negligence.[ ] Even resolving all inferences in appellant's favor, the undisputed facts here simply do not show that Hatmaker's failure falls into the former category. *Appellant cannot point to any facts that show he made a deliberate choice not to give McCoy a chance to survive, and, at the end of the day, it is deliberateness that lies at the core of the Tatum standard of willfulness and wantonness.*

In reaching its decision, the court pointed to the undisputed facts concerning the efforts to assess the decedent's condition and save his life. These included an extensive physical examination of the victim, despite the failure to follow other protocols. *Id.* at 708, 763 A.2d at 1241.

Here, as already discussed, the Act is the exclusive remedy, *except* if "a covered employee is injured or killed as the result of the deliberate intent of the employer [or insurer] to injure or kill the covered employee . . ." L.E. § 9-509(d). As previously discussed in the context of Count I, the Complaint fails to allege facts that, if proved, would establish the egregious and deliberate wantonness required to set forth a claim for gross negligence. *See, e.g., Flood, supra*, 230 Md. at 379, 187 A.2d at 323 (in suit brought by claimant against the workers' compensation insurer for negligent selection of physicians, the employee was "barred from bringing this action

respiratory and cardiac arrest when she encountered him." *Id.* "When asked, *inter alia*, 'whether the administration of oxygen in the ambulance would have permitted Norman Tatum to survive this attack?,' he responded in part that 'lack of oxygen is the main reason why Mr. Tatum showed the findings that he showed at autopsy, and I infer from that caused his death....'" *Id.*

On appeal, the court discussed whether the actions of Paramedic Gigliotti constituted gross negligence under the Good Samaritan Statute. *Id.* at 565, 565 A.2d at 356. It determined that the trial judge properly granted summary judgment, stating: "[A]lthough the actions of defendant Gigliotti may have amounted to negligence, they do not satisfy the threshold of gross negligence." *Id.*

22

against the appellee-insurer as to the alleged malpractice of the physicians recommended by it to the appellant."); *see also Great Atlantic, supra*, 346 Md. at 586 n.9, 587, 697 A.2d at 891, 891 n.9 (1997) (explaining that *Flood* was not so broad as to stand "for the proposition that an employee can never maintain an action sounding in tort against his employer's workers' compensation carrier for alleged acts of negligence that result in a work-related injury," but adding: "Obviously, if the negligence of a workers' compensation insurer injures an employee of its insured *outside the employment context*, a direct action unencumbered by the Workers' Compensation Act would certainly lie.") (Emphasis added.) *Id.* at 586 n.9, 697 A.2d at 891 n.9.

### III. Count Three: Wrongful Death

As the spouse of the Decedent, Mr. Respess has brought a claim for wrongful death.[18]

He avers:

> That as a direct and proximate result of the breaches of the duties by the Defendants in causing the death of Patricia Respess, the Plaintiff James Respess as the husband of Patricia Respess suffered pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of marital care, loss of attention, loss of advice, loss of counsel, loss of training and loss of guidance.

Compl. ¶ 56.

In their Memorandum, Defendants did not specifically focus on the wrongful death claim.

In their Opposition, Plaintiffs briefly address the wrongful death claim, stating:

> Plaintiff understands that in order to prove the count of gross negligence and sustain the wrongful death action against the Defendants, Plaintiff "must prove that the defendant's action . . . resulted in the decedent's having an uncontrollable impulse to commit suicide, 'in the sense that the decedent could not have decided against and refrained from killing [herself], and because of such uncontrollable impulse, the decedent committed suicide.[']"

Opposition 17 (quoting *District of Columbia v. Peters*, 527 A.2d 1269, 1276 (1987)) (citation

---

[18] Mr. Respess has not cited any statutory authority for his claim.

omitted).  In their Reply, Defendants argue that "Plaintiff's Claims for Gross Negligence and Wrongful Death Should be Dismissed," because there is no cause of action for grossly negligent infliction of emotional distress, and because both claims are based on a duty that does not exist. *See* Reply 7.

Maryland's Wrongful Death Act is set forth in C.J. (2006 Repl. Vol., 2010 Supp.) §§ 3-901 through 3-904.  C.J. § 3-902, titled "Liability notwithstanding death," provides that wrongful death actions "may be maintained against a person whose wrongful act causes the death of another."  C.J. § 3-902(a). "[A] wrongful death action is brought by the relatives of the decedent, seeking recovery for their loss as a result of the victim's death." *Jones v. Prince George's Cnty.*, 541 F. Supp. 2d 761 (D. Md. 2008) (citation omitted).  Such an action "'is brought in the name of a person entitled to recover . . . .'" *Williams v. Work*, 192 Md. App. 438, 452, 995 A.2d 744, 753 (quoting *Walker v. Essex*, 318 Md. 516, 523, 569 A.2d 645, 648 (1990)), *cert. granted sub nom. Ace American Ins. Co. v. Williams*, 415 Md. 607, 4 A.3d 512 (2010). *See Eagan v. Calhoun*, 347 Md. 72, 82, 698 A.2d 1097, 1102 (1997) (a wrongful death action "is brought by a spouse, parent, or child, or a secondary beneficiary who was wholly dependent on the decedent, to recover damages for his or her own loss accruing from the decedent's death); *United States v. Streidel*, 329 Md. 533, 536, 620 A.2d 905, 907 (1993); C.J. § 3-904(d) ("damages awarded . . . are not limited or restricted by the 'pecuniary loss' or 'pecuniary benefit' rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable for the death of . . . (1) A spouse; . . . .").

In order for a beneficiary to maintain a wrongful death action, there must have been a "wrongful act," defined as "an act, neglect, or default including a felonious act which would

have entitled the party injured to maintain an action and recover damages if death had not ensued." C.J. § 3-901(e).  In *Benjamin v. Union Carbide Corp*., 162 Md. App. 173, 188-89, 873 A.2d 463, 472 (2005), *aff'd sub nom. Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 904 A.2d 511 (2006), the Maryland Court of Special Appeals explained: "We interpret the definition as meaning that the decedent must have been able to maintain a compensable action *as of the time of death*. In other words, in order for an act to be wrongful, the decedent must have had a compensable action as of death."  (Emphasis in original).  However, ". . . if a defense existed to the decedent's action prior to death, there was no viable action to abate and, similarly, no wrongful act for wrongful death purposes."  *Id.* at 189, 873 A.2d at 472.

*Austin v. Thrifty Diversified, Inc.*, 76 Md. App. 150, 543 A.2d 889 (1988), is instructive. In that case, the parents of a deceased worker brought an action for the wrongful death of their son, alleging, *inter alia*, that the employer negligently failed to maintain equipment used by their deceased son.  *Id.* at 152, 543 A.2d at 890.  At trial, the employer moved for summary judgment, claiming that the parents' exclusive remedy was under the Act.  *Id.* at 152, 543 A.2d at 890-91. The trial court granted summary judgment for the defense.  *Id.* at 152, 543 A.2d at 891.  On appeal, the Maryland Court of Special Appeals determined that the employee was injured in the course of his employment even though, at the time of his death, he was using the employer's equipment to work on a personal project, with permission to do so.  *Id.* at 154-55, 543 A.2d at 892.  Under that circumstance, the court determined that the remedies under the Act were exclusive.  *Id.* at 155, 543 A.2d at 892.

Here, the plaintiffs have not set forth viable claims for intentional infliction of emotional distress or gross negligence.  But, even assuming that the Complaint adequately alleged that the Insurer was negligent, then the remedies provided to the spouse of a deceased worker under the

Maryland Workers' Compensation Act would be exclusive. *See, e.g.*, L.E. § 9-501 (requiring compensation to "the dependents of the covered employee for death of the covered employee" resulting from accidental injury); L.E. § 9-502 (requiring compensation to dependents of the covered employee for death of the covered employee resulting from an occupational disease); L.E. § 9-678 ("A dependent of a covered employee who is entitled to compensation for the death of the covered employee resulting from an accidental personal injury or occupational disease shall be paid compensation in accordance with this Part XII of this subtitle."); L.E. § 9-681 (establishing the amount of death benefits to be paid "individuals who were wholly dependent on a deceased covered employee at the time of death resulting from an accidental personal injury or occupational disease"); L.E. § 9-682 (establishing the amount of death benefits to be paid individuals who were partly dependent). Given that the allegations of Counts I and II are deficient, as explained, Mr. Respess has failed to allege conduct outside the purview of the exclusivity provision of the Maryland Workers' Compensation Act. It follows that his Wrongful Death Claim must also fail.

## CONCLUSION

The Defendants' Motion to Dismiss the Complaint is GRANTED, without prejudice. Leave to amend the Complaint shall be granted. *See* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"). A separate Amended Order follows.

Date: March 15, 2011

___/s/_____
Ellen Lipton Hollander
United States District Judge